J-S11030-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| HAKEEM ABDU JONES | |
| Appellant | No. 1839 EDA 2017 |

Appeal from the PCRA Order Entered May 15, 2017
In the Court of Common Pleas of Montgomery County
Criminal Division at No.: CP-46-CR-0006989-2011

BEFORE:  OTT, STABILE, and MUSMANNO, JJ.

MEMORANDUM BY STABILE, J.:                    **FILED MAY 18, 2018**

Appellant Hakeem Abdu Jones appeals from the May 15, 2017 order of the Court of Common Pleas of Montgomery County, which denied his request for collateral relief pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-56.  Upon review, we affirm.

The facts and procedural history of this case are undisputed.  As summarized by the PCRA court:

> On September 2, 2011, Officers Edward Todd and Darren Buckwalter of the Norristown Police Department responded to an anonymous tip received at approximately 2:08 p.m. of "(4) black males wearing t-shirts" in the area of the 900 block of West Jackson and Noble and Lafayette Streets, that had been seen selling heroin, held in their pockets, on the corner for approximately one hour.  Officer Todd testified that based on his experience at the time that area was considered a high-crime area.  Additionally, Officer Todd testified that at the time he responded to this anonymous tip, he was particularly mindful of two other recent incidents involving gunfire in the area, in which

authorities had yet to detain suspects. More specifically, through a Roll Call Notice or Report of Criminal Activity issued by Sergeant Crescitelli on September 2, 2011, Officer Todd learned of the following two incidents:

On 8/3/11 at 1937 hours a home invasion occurred at 940 W. Jackson Street. The actors fired numerous rounds into the residence. The firearm was a 40 caliber. The only description of the actors are two black males, medium build, 5'8" to 5'10."

On 9/1/11 at 1855 hours several shots were fired on the 900 block of West Lafayette Street. The firearm was again a 40 caliber. Two black males in there [sic] twenties were seen running from the scene. There is no other description. Two vehicles were possibly involved in the shooting. One was described as a gray or silver sedan, possibly a Buick. The second was a black Jeep with a life gate mounted spare tire with a "Jeep" cover on it.

There are currently no suspects in these incidents however it appears they may be related. Please keep check on this area as there is apparently some type of feud going on. Thank you.

With this information on hand, officers arrived on scene at 2:14 p.m., approximately 6 minutes after the tip was initially called in, and, while they did not see any individuals on the corner identified in the tip, they did locate a group of six (6) black men, wearing white t-shirts, sitting on the porch steps of a row home about four houses from the corner or a half a block away. Officer Todd testified that these men were the ***only individuals on the entire block*** at the time. After approaching the men, the officers inquired of them whether any of them resided at the home in front of which they were seated. They responded that no one did. Subsequently, an individual emerged from the home and confirmed he neither knew the men, nor did they reside in the home.

At that point, the officers began to collect biographical information from the men to comply with their department's policy on collecting information. More specifically, Officer Todd asked [Appellant] for his identification and he supplied a driver's license with the name "Hakeem Tarte," reflecting that he lived in Philadelphia; which the officers retained while speaking to the

- 2 -

group. The officers collected biographical information from the other individuals verbally, as aside from [Appellant], none of the men could produce any forms of physical identification. Given the high-crime, high-drug area, and the fact that the officers were out-numbered by these individuals fitting the anonymous tip's description, and the fact they were trespassing, coupled with recent reports of unsolved gun violence, the officers opted to conduct pat-downs for officer safety. Officer Todd proceeded from left to right, beginning with a pat down of Dante Walls. After finding no weapons the officer permitted Wells to be seated. Then, as Officer Todd took a step toward [Appellant] to begin his pat-down procedure, [Appellant] jumped up from the edge of the step on which he was seated and fled.

Officer Todd gave chase, and during the chase, saw [Appellant] discard a black object drawn from his waistband which gave a heavy metallic thud when it hit the ground. After [Appellant] had run several blocks, Officer Todd lost track of him, and so the officer retraced the chase and located a .38 special revolver at the location where [Appellant] had discarded the object from his waistband. In addition to advising his colleagues of [Appellant's] last-known whereabouts, Officer Todd also questioned nearby residents as to whether they had witnessed [Appellant] fleeing. Ultimately, Officer Todd surmised that [Appellant] might have fled down a nearby bike trail and advised his colleagues to continue their search near the river. Corporal Kenneth Lawless located [Appellant] on that bike trail near the river, after overhearing [Appellant] shouting into his phone that he had thrown his gun away. When he realized that Corporal Lawless was in close pursuit, [Appellant] fled again, jumped into the river; at which point he was finally apprehended.

PCRA Court Opinion, 9/25/17, at 1-4 (unnecessary capitalizations, footnotes and internal record citations omitted) (emphasis in original). Appellant was charged with, *inter alia*, persons not to possess firearms under 18 Pa.C.S.A. § 6105(a)(1). Eventually, following a two-day jury trial, Appellant was found guilty of persons not to possess firearms. On November 20, 2012, the trial

court sentenced Appellant to three to six years' imprisonment. Appellant did not file any post-sentence motions or a direct appeal.

On May 1, 2013, Appellant *pro se* filed the instant PCRA petition, alleging ineffective assistance of counsel. The PCRA court appointed counsel, who filed an amended PCRA petition on November 18, 2015. Counsel, with leave of court, filed a second amended PCRA petition on February 10, 2016.

On August 16, 2016, the PCRA court conducted an evidentiary hearing on the petition. Both sides offered witness testimony. On May 15, 2017, the PCRA court denied Appellant relief. Appellant timely appealed to this Court. The PCRA court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied, raising several assertions of error. In response, the PCRA court issued a Pa.R.A.P. 1925(a) opinion, concluding that Appellant was not entitled to relief.

On appeal,[1] Appellant raises a single issue for our review: "Whether the [PCRA] court erred in denying Appellant's [PCRA] petition." Appellant's Brief at 9 (capitalization omitted). At the core, Appellant argues that the PCRA court erred in concluding that the police officers had reasonable suspicion to detain him. As a result, Appellant claims that the PCRA court's conclusion--

---

[1] "In PCRA proceedings, an appellate court's scope of review is limited by the PCRA's parameters; since most PCRA appeals involve mixed questions of fact and law, the standard of review is whether the PCRA court's findings are supported by the record and free of legal error." ***Commonwealth v. Pitts***, 981 A.2d 875, 878 (Pa. 2009) (citation omitted).

- 4 -

that his trial counsel was not ineffective in seeking the suppression of the .38 special revolver—was in error.

We presume that counsel is effective, and the appellant bears the burden to prove otherwise. *See Commonwealth v. Bennett*, 57 A.3d 1185, 1195 (Pa. 2012). The test for ineffective assistance of counsel is the same under both the Federal and Pennsylvania Constitutions. *See Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Commonwealth v. Jones*, 815 A.2d 598, 611 (Pa. 2002). A PCRA petitioner is entitled to relief if he pleads and proves that prior counsel rendered ineffective assistance of counsel. 42 Pa.C.S.A. § 9543(a)(2)(ii). "To prevail on an [ineffectiveness] claim, a PCRA petitioner must plead and prove by a preponderance of the evidence that (1) the underlying legal claim has arguable merit; (2) counsel had no reasonable basis for acting or failing to act; and (3) the petitioner suffered resulting prejudice." *Commonwealth v. Reyes-Rodriguez*, 111 A.3d 775, 780 (Pa. Super. 2015) (*en banc*). "A petitioner must prove all three factors of the "*Pierce*[2] test," or the claim fails." *Id.*

Article I, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution protect the people from unreasonable searches and seizures. *Commonwealth v. Lyles*, 97 A.3d 298, 302 (Pa. 2014) (citation omitted). The *Lyles* Court explained:

---

[2] *Commonwealth v. Pierce*, 527 A.2d 973 (Pa. 1987).

Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police. The first, a "mere encounter," does not require any level of suspicion or carry any official compulsion to stop and respond. The second, an "investigatory detention," permits the temporary detention of an individual if supported by reasonable suspicion. The third is an arrest or custodial detention, which must be supported by probable cause.

In evaluating the level of interaction, courts conduct an objective examination of the totality of the surrounding circumstances. . . . The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred—to guide the inquiry, the United States Supreme Court and [our Supreme] Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. What constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.

[Our Supreme] Court and the United States Supreme Court have repeatedly held a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual so long as the officers do not convey a message that compliance with their requests is required. Although police may request a person's identification, such individual still maintains the right to ignore the police and go about his business.

*Id.* at 302-03 (internal citations and quotation marks omitted).

The Court further explained that "a request for identification does not *in and of itself* elevate what would otherwise be a mere encounter into an investigative detention." *Id.* at 304 (emphasis in original). Despite this general principle, however, "an encounter involving a request could rise to a detention when coupled with circumstances of restraint of liberty, physical

force, show of authority, or some level of coercion beyond the officer's mere employment, conveying a demand for compliance or that there will be tangible consequences from a refusal." *Id.* A mere encounter escalates to investigatory detention when a police officer takes and maintains possession of an individual's identification card to check whether the individual has any outstanding warrants. *Commonwealth v. Hudson*, 995 A.2d 1253, 1258-59 (Pa. Super. 2010); *see also Lyles*, 97 A.3d at 306 (noting that the police officer's interaction with appellant did not rise to investigatory detention where "[t]he officer did not question appellant further while he was holding the identification, and he did not use appellant's information to run a background check").

In *Hudson*, a police officer observed appellant outside of a corner grocery store with an adult male. The officer drove past the store several times over the course of an hour and saw appellant go inside the store whenever appellant noticed the police cruiser. On his third drive-by, the officer approached appellant as he was walking down a street with another man. Following a brief conversion, the officer asked the two men whether they had identification. They did. Appellant and his male companion provided their Pennsylvania identification cards. Upon receipt, the officer took their identification cards to the police cruiser to run a warrant and scofflaw check. Ultimately, it turned out that appellant had a scofflaw warrant for a summary harassment charge. The officer arrested appellant and, incident to the arrest, searched appellant's person and discovered drugs and cash.

Based on these facts, the **Hudson** Court concluded the officer "effectuated an investigative detention at the time that [the officer] took and maintained possession of [appellant's] identification." 995 A.2d at 1259. The **Hudson** Court also concluded that the officer did not have reasonable suspicion to detain appellant for investigation because the officer at best "observed [appellant] meeting with three men and walking into and out of a grocery store, all of which are lawful activities." **Id.** Accordingly, the **Hudson** Court held that the officer's investigative detention of appellant was constitutionally infirm and, as a result, overruled the trial court's denial of appellant's motion to suppress the seized evidence. In so doing, this Court, *inter alia*, vacated appellant's judgment of sentence.

Here, the officers' initial interaction with Appellant amounted only to a mere encounter, despite the fact that they requested his identification.[3] Unlike **Hudson**, the officers here did not use Appellant's driver's license to run a background check. In fact, like the officer in **Lyles**, the officers here neither questioned Appellant further while they were holding his driver's license nor used the license to run a background check. Accordingly, the PCRA court did not err in concluding that the officers' initial interaction with Appellant constituted a mere encounter.[4]

_____

[3] Unlike the other individuals on the porch steps, Appellant fled **before** the police could perform a pat-down search of him.

[4] To the extent Appellant invites us to choose his version of the facts over the PCRA court's, we decline the invitation. **See Commonwealth v. Rigg**, 84

Our inquiry, however, does not terminate here. Although the initial interaction amounted only to a mere encounter, it escalated into an investigative detention when the officers pursued Appellant and detained him near the river. Thus, we next must determine whether the officers had reasonable suspicion to detain Appellant after he fled from the front porch.

It is settled that reasonable suspicion necessary for investigative detentions

> is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

***Commonwealth v. Davis***, 102 A.3d 996, 1000 (Pa. Super. 2014) (citations omitted). "In order to justify an investigative detention, the police must have reasonable suspicion that criminal activity is afoot. Reasonable suspicion must be based on specific and articulable facts, and it must be assessed based upon the totality of the circumstances viewed through the eyes of a trained police officer." ***Commonwealth v. Williams***, 980 A.2d 667, 672 (Pa. Super. 2009) (citation omitted), ***appeal denied***, 990 A.2d 730 (Pa. 2010). Thus, "[t]he determination of whether an officer had reasonable suspicion that criminality was afoot so as to justify an investigatory detention is an objective one, which

---

A.3d 1080, 1084 (Pa. Super. 2014) (explaining that we grant great deference to the PCRA court's findings that are supported in the record and will not disturb them unless they have no support in the certified record).

must be considered in light of the totality of the circumstances." **Commonwealth v. Holmes**, 14 A.3d 89, 96 (Pa. 2011) (emphasis added). In assessing the totality of the circumstances, a court must give weight to the inferences that a police officer may draw through training and experience. **Id.** at 95. Reasonable suspicion does not require that the activity in question must be unquestionably criminal before an officer may investigate further. **Davis**, 102 A.3d at 1000 (citations omitted). "Rather, the test is what it purports to be—it requires a suspicion of criminal conduct that is reasonable based upon facts of the matter." **Id.** (citation and emphasis omitted).

Instantly, we find instructive **Commonwealth v. D.M. II**, 781 A.2d 1161 (Pa. 2001) and **Commonwealth v. Walls**, 53 A.3d 889 (Pa. Super. 2012), in deciding whether the officers possessed reasonable suspicion to detain Appellant.

In **D.M. II**, a police officer received a radio call regarding a man with a gun at 28th Street and Cecil B. Moore Avenue in Philadelphia. **D.M. II**, 781 A.2d at 1162. The officer was only one block from the location at the time of the call. The anonymous tip described the man as a "black male, wearing a white t-shirt, blue jeans and white sneakers." **Id.** The officer arrived at the scene and saw the appellant, who matched the description given by the anonymous tip. **Id.** The officer exited his vehicle and told the appellant "to come over." **Id.** The appellant, however, took off running instead. **Id.** Eventually, backup arrived and the appellant found himself cornered between two police cars. **Id.** The officer ordered the appellant to put his hands on the

hood of the car in front of him and proceeded to pat the appellant down for officer safety. *Id.* The officer recovered a .32 caliber handgun that fell out of the appellant's pant leg. *Id.* Given the facts, our Supreme Court determined that the officer had the reasonable suspicion necessary to stop the appellant. *Id.* at 1164-65. In so doing, the Supreme Court noted that under *Illinois v. Wardlow*, 528 U.S. 119 (2000), "unprovoked flight could be considered among the relevant contextual considerations, since 'nervous, evasive behavior is a pertinent factor in determining reasonable suspicion' and 'headlong flight—whenever it occurs—is the consummate act of evasion.'" *D.M. II*, 781 A.2d at 1164 (citing *Wardlow*, 528 U.S. at 124).

In *Walls*, a police officer received information over his radio that a black male wearing a black coat and black jeans was observed at an intersection carrying a gun. The officer stopped an individual, who matched the description of the suspect with regard to gender, race, and clothing, one-half block away from the identified location. After seeing the officer, the individual fled. *Walls*, 53 A.3d at 894. Relying upon *D.M. II* and *Wardlow*, the *Walls* Court concluded that an unprovoked flight combined with an individual's proximity to the subject location and his match to the description of the suspect, gave "rise to reasonable suspicion that criminal activity was afoot." *Id.* at 894.

We find *D.M. II* and *Walls* highly instructive. As recited earlier, here the officers received an anonymous tip that four black males wearing white t-shirts were selling heroin in the 900 block of West Jackson and Noble and Lafayette Streets. The officers, based on their experience, described the

location as high-crime and high-drug. When the officers arrived, they did not find anyone at the exact location, but spotted Appellant with five other individuals on the porch steps of a row home half a block away. Appellant as well as the other five individuals matched the description of the suspects. The officers approached the individuals and asked them whether they resided at the home in front of which they were seated. They all responded in the negative. In fact, a person who emerged from inside the house confirmed that the individuals did not reside there and that he did not know them. At that point, the officers asked for identification. Appellant complied. However, shortly after the officers initiated a pat-down search of the individuals, Appellant jumped up from the edge of the step upon which he was seated and fled. Officer Todd chased Appellant and, during the chase, he observed Appellant discard a black object, which later turned out to be a .38 special revolver.

Given the totality of the circumstances here, and consistent with the holdings in **D.M. II** and **Walls**, we are constrained to agree with the PCRA court that the officers possessed the requisite reasonable suspicion to stop Appellant after he fled from the porch steps. Accordingly, the PCRA court did not err in concluding that Appellant's ineffectiveness claim lacks arguable merit. In addition, we conclude, after careful review of the record and the relevant case law, that the PCRA court accurately and thoroughly addressed the merits of Appellant's claim. **See** PCRA Court Opinion, 9/25/17, at 7-13. Accordingly, we affirm the PCRA court's May 15, 2017 order denying Appellant

PCRA relief.  We further direct that a copy of the PRCA court's opinion dated

September 25, 2017 be attached to any future filings in this case.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/18/18

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA:      NO. 6989-11
                          :      1839 EDA 2017

         v.                       :

                          :

HAKEEM JONES                :

**OPINION**

**Branca, J.**                                         **September 25, 2017**

## I.    INTRODUCTION

Hakeem Jones ("Defendant") appeals to the Superior Court from this Court's Order dated

May 15, 2017, denying Defendant's Post-Conviction Relief Act ("PCRA") Petition. For the

reasons that follow, Defendant's appeal is without merit.

## II.    STATEMENT OF THE CASE

### A.    Factual History

On September 3, 2011, Officers Edward Todd and Darren Buckwalter of the Norristown

Police Department responded to an anonymous tip received at approximately 2:08pm of "(4)

black males wearing white t-shirts" in the area of the 900 block of West Jackson and Noble and

Lafayette Streets, that had been seen selling heroin, held in their pockets, on the corner for

approximately one hour.[1] Officer Todd testified that based on his experience at the time that

area was considered a high-crime area.[2] Additionally, Officer Todd testified that at the time he

responded to this anonymous tip, he was particularly mindful of two other recent incidents

involving gunfire in the area, in which authorities had yet to detain suspects. More specifically,

---



[1] [Aff. of Probable Cause, p. 5 of 12 (10/6/11)]; [N.T. 8/16/16, at 68-70, Ex. C-14 ("Event Search")].
[2] [N.T. 8/16/16, at 65].

1



through a Roll Call Notice or Report of Criminal Activity issued by Sergeant Crescitelli on September 2, 2011, Officer Todd learned of the following two incidents:[3]

> On 8/31/11 at 1937 hours a home invasion occurred at 940 W. Jackson Street. The actors fired numerous rounds into the residence. The firearm was a 40 caliber. The only description of the actors are two black males, medium build, 5'8" to 5'10."

> On 9/1/11 at 1855 hours several shots were fired on the 900 block of West Lafayette Street. The firearm was again a 40 caliber. Two black males in there [sic] twenties were seen running from the scene. There is no other description. Two vehicles were possibly involved in the shooting. One was described as a gray or silver sedan, possibly a Buick. The second was a black Jeep with a life gate mounted spare tire with a "Jeep" cover on it.

> There are currently no suspects in these incidents however it appears they may be related. Please keep a check on this area as there is apparently some type of feud going on. Thank you.

With this information in hand, officers arrived on scene at 2:14pm, approximately 6 minutes after the tip was initially called in, and, while they did not see any individuals on the corner identified in the tip, they did locate a group of six (6) black men, wearing white t-shirts, sitting on the porch steps of a row home about four houses from the corner or a half a block away.[4] Officer Todd testified that these men were the *only individuals on the entire block* at the time. After approaching the men, the officers inquired of them whether any of them resided at the home in front of which they were seated. They responded that no one did.[5] Subsequently, an individual emerged from the home and confirmed he neither knew the men, nor did they reside in the home.[6]

_____

[3] [N.T. 8/16/16, at 65, Ex. D-1 ("Report of Criminal Activity].
[4] [N.T. 8/16/16, at 71, 78; N.T. 8/16/16, at Ex. C-14].
[5] [N.T. 6/27/12, at 33; N.T. 8/16/16, at 74].
[6] [N.T. 6/27/12, at 33; N.T. 8/16/16, at 74].

2

At that point, the officers began to collect biographical information from the men to comply with their department's policy on collecting information.[7] More specifically, Officer Todd asked Defendant for his identification and he supplied a driver's license with the name "Hakeem Tarte," reflecting that he lived in Philadelphia; which the officers retained while speaking to the group.[8] The officers collected biographical information from the other individuals verbally, as aside from Defendant, none of the men could produce any forms of physical identification. Given the high crime, high drug area, and the fact that the officers were out-numbered by these individuals fitting the anonymous tip's description, and the fact they were trespassing, coupled with recent reports of unsolved gun violence, the officers opted to conduct pat downs for officer safety. Officer Todd proceeded from left to right, beginning with a pat down of Dante Wells. After finding no weapons the officer permitted Wells to be seated. Then, as Officer Todd took a step towards Defendant to begin his pat down procedure, Defendant jumped up from the edge of the step on which he was seated and fled.[9]

Officer Todd gave chase, and during the chase, saw Defendant discard a black object drawn from his waistband which gave a heavy metallic thud when it hit the ground.[10] After Defendant had run several blocks, Officer Todd lost track of him, and so the officer retraced the chase and located a .38 Special revolver at the location where Defendant had discarded the object from his waistband.[11] In addition to advising his colleagues of Defendant's last-known whereabouts, Officer Todd also questioned nearby residents as to whether they had witnessed Defendant fleeing.[12] Ultimately, Officer Todd surmised that Defendant might have fled down a

---

[7] [N.T. 8/16/16, at 74].
[8] [N.T. 6/27/12, at 78; N.T. 8/16/16 at 74-75].
[9] [N.T. 6/27/12, at 35; N.T. 8/16/16, at 76-78].
[10] [N.T. 8/16/16, at 81].
[11] [N.T. 8/16/16, at 82-83].
[12] [N.T. 8/16/16, at 82].

3

nearby bike trail and advised his colleagues to continue their search near the river.[13] Corporal Kenneth Lawless located Defendant on that bike trail near the river, after overhearing Defendant shouting into his phone that he had thrown his gun away.[14] When he realized that Corporal Lawless was in close pursuit, Defendant fled again, and jumped into the river; at which point he was finally apprehended.[15]

## B. Procedural History

The Commonwealth subsequently charged Defendant by Bill of Information 6989-11 with Count One (Persons Not to Possess-Felony of the 2nd Degree,[16]) Count Two (Firearms Not to Be Carried-Felony of the 3rd Degree,[17]) Count Three (Disorderly Conduct-Summary,[18]) and Count Four (Loitering for Unlawful Purposes- Summary.[19])

Defendant's trial counsel, Herbert McDuffy, Jr., Esquire, opted against filing a motion to suppress based on a claim that the initial encounter of Defendant by the police was an illegal detention. He testified that he determined that such a motion would have little chance of success in light the totality of the circumstances.[20] Instead, to garner the best result for Defendant, Mr. McDuffy deemed it more appropriate to avoid trial all together by negotiating a plea agreement for his client; thereby shielding him from an uncertain result and the potential for a weighty sentence in light of Defendant's previous conviction for a gun charge and the potential for conviction of the charge of felon not to possess a firearm which carries a ten (10) year maximum, and firearms without a license which carries a seven (7) year maximum.[21] Defendant's counsel

---

[13] [N.T. 8/16/16, at 82].
[14] [N.T. 8/16/16, at 105].
[15] [N.T. 8/16/16, at 106].
[16] 18 Pa. C.S. § 6105(a)(1).
[17] 18 Pa. C.S. § 6106(a)(1).
[18] 18 Pa. C.S. § 5503(a)(4).
[19] Norristown Borough Code § 204-7C.
[20] [N.T. 8/16/16, at 13-14].
[21] [N.T. 8/16/16, at 14].

4

was specifically concerned that the sentence on the two firearms charges would be run consecutively instead of concurrently, on top of Defendant's exposure for violating the supervision related to his previous gun conviction. He therefore believed that Defendant's best option was to work out a deal for concurrent time.

Ultimately, counsel negotiated what he believed to be an exceptional plea deal for Defendant, wherein in exchange for a plea of guilty to the gun charges, Defendant serve two and a half (2 ½) to five (5) years of imprisonment concurrent to any underlying sentence for parole violations.[22] Defendant, however, rejected the plea agreement, and instead opted to proceed to trial before a jury, notwithstanding the thorough colloquy of Defendant by the Honorable Thomas M. Del Ricci wherein he was advised of the unfavorable sentencing consequences he potentially faced if found guilty. Defense counsel's analysis of the futility of a suppression motion did not change with Defendant's decision to reject the plea deal and go to trial. Trial before Judge Del Ricci ultimately resulted in the grant of a mistrial on June 19, 2012, after the Commonwealth permitted the jury to observe the gun allegedly possessed by Defendant, which the Commonwealth did not introduce, nor apparently intend to introduce, into evidence. Subsequently, Court Administration transferred this case to the undersigned for trial.

On June 27, 2012, after a two-day trial, before the undersigned in which the Commonwealth proceeded only on Count One (Person Not to Possess Firearm,)[23] the jury found Defendant guilty of that charge.[24] On November 20, 2012, after receipt and review of the previously-ordered pre-sentence investigation (PSI,) the Court sentenced Defendant to three (3) to six (6) years of incarceration.[25] Despite being advised of his post-sentence and appellate

---

[22] [N.T. 6/18/12, at 4-11].
[23] 18 Pa. C.S. § 6105(a)(1).
[24] [N.T. 6/28/12, at 99].
[25] [N.T. 11/20/12, at 22].

rights by the undersigned, Defendant did not file either a post-sentence motion or a direct appeal.[26]

On May 1, 2013, Defendant timely filed a pro se PCRA Petition asserting that his trial counsel had been ineffective, and requesting the appointment of PCRA counsel.[27] By Order dated May 9, 2013, the Court appointed the Montgomery County Public Defender's Office ("PCRA Counsel") to represent Defendant on his pro se PCRA Petition.[28] On November 18, 2015, Defendant filed his First Amended PCRA Petition.[29] On December 21, 2015, the Commonwealth responded with an Answer and Partial Motion to Dismiss Defendant's PCRA. On January 15, 2016, Defendant requested leave to file a second amended PCRA petition, which was granted by the Court on January 21, 2016. On February 10, 2016, Defendant filed a Second Amended PCRA Petition. On August 16, 2016, the Court conducted an evidentiary hearing, and thereafter, counsel submitted post-hearing briefs. The Court denied the Defendant's Second Amended PCRA Petition by Order dated May 15, 2017. On June 12, 2017, Defendant timely filed the instant appeal. On June 26, 2017, Defendant filed a timely Pa. R.A.P. 1925(b) Statement ("1925(b) Statement,") setting forth the following issue for review.

## II.   ISSUES PRESENTED

1.   The trial court erred in denying Appellant's request for PCRA relief as follows:

a.   Counsel was ineffective in failing to challenge the legality of the seizure, illegal detention, investigative detention, chase and ultimate arrest of Appellant.

b.   Counsel was ineffective for failing to visit the scene of the encounter, subsequent chase and arrest where such an investigation would have led to significant discrepancies in the testimony of the officers as to the distance,

---

[26] [N.T. 11/20//12, at 23-24].

[27] [Pro Se Motion for Post-Conviction Collateral Relief (filed 5/1/13)].

[28] See Pa. R. Crim. P. 904(c).

[29] [Def.'s 1st Am. PCRA Pet. (11/18/15); Def.'s Praec. To Attach Ex. A (11/23/15)].

6

positioning and location of appellant, the physical description of the scene and appellant's and the officer's perceptions and appellant's alleged perceptions as testified to by the officer.

c.  Counsel was ineffective in failing to file a motion to bar a retrial where questionably inadmissible evidence was left in plain view of the jury so as to force them to focus on it and to attack the defense case as disingenuous thereby suggesting to the jury that even if the gun was inadmissible Appellant possessed a gun.

d.  Counsel was ineffective for failing to file a direct appeal.

e.  Counsel was ineffective in failing to impeach the Officers over the time and sequence of events that led to appellant's arrest.

## III.  DISCUSSION

On appeal, the standard of review for an order denying PCRA relief calls for a determination of whether the PCRA court's findings are supported by evidence of record and free of legal error. *Commonwealth v. Rykard*, 55 A.3d 1177, 1183 (Pa. Super. Ct. 2012). In addition, when reviewing the propriety of an order denying PCRA relief, our Superior Court will consider the record in the light most favorable to the prevailing party at the PCRA level. *Commonwealth v. Stultz*, 114 A.3d 865, 872 (Pa. Super. Ct. 2015) (internal citation omitted). Finally, great deference is granted to the PCRA court's findings and an appellate court will not disturb those findings unless they lack any support in the certified record. *Commonwealth v. Rigg*, 84 A.3d 1080, 1084 (Pa. Super. Ct. 2014).

Generally, counsel is presumed effective, unless a defendant proves otherwise. *Commonwealth v. Williams*, 732 A.2d 1167, 1177 (Pa. 1999). Thus, to set forth a viable ineffective assistance of counsel claim under the PCRA, a defendant must plead and prove by a preponderance of the evidence that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa. C.S. § 9543(a)(2)(ii). To overcome the presumption of counsel's effectiveness, a

7

defendant must establish that: (1) the underlying claim is of arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) defendant suffered prejudice as a result of counsel's error such that there is a reasonable probability that the result of the proceeding would have been different absent such error. *Commonwealth v. Fears*, 86 A.3d 795, 804 (Pa. 2014) (internal citations omitted). Failure to prove any one prong of the above enumerated criteria will defeat defendant's claim. *Id.* (internal citation omitted).

## A. The Court Properly Denied Defendant's Second Amended PCRA Petition.

As demonstrated hereinafter, Defendant's claim that his counsel was ineffective is meritless, and therefore, the Court properly denied Defendant's Second Amended PCRA Petition. While Defendant's PCRA counsel conceded in her post- PCRA hearing brief, "that the claims that trial counsel was ineffective in failing to visit the scene of the arrest and in failing to file a requested direct appeal cannot be sustained," Defendant has, nonetheless, included those issues for review in his 1925(b) Statement.[30] As such, the Court will address Defendant's claims on appeal, seriatim.

### i. Counsel Had Reasonable Basis For Not Seeking Suppression.

First, Defendant claims his counsel was ineffective for failing to challenge the legality of the seizure of the weapon by police. It is, however, well-settled that where an ineffectiveness claim is based on the failure of counsel to move for suppression of evidence, that defendant must establish preliminarily that his counsel lacked a reasonable basis for not pursuing a suppression claim. *See Commonwealth v. Arch*, 654 A.2d 1141, 1143 (Pa. Super. Ct. 1995).

---

[30] [Def.'s Mem. In Supp. of PCRA Pet., p. 2 of 11 (2/28/17)]. As an administrative matter, initial appointed PCRA counsel, Christa M. Miller, Esquire, departed from the Montgomery County Public Defender's Office during the dependency of the underlying PCRA Petition, and was replaced by Montgomery County Public Defender Raymond D. Roberts, Esquire.

To aid their analysis of searches and seizures, our courts traditionally recognize the following three categories of police interaction:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Williams*, 73 A.3d 609, 613 (Pa. Super. Ct. 2013) (citation omitted).

Additionally, our Supreme Court has held that pursuant to governing Fourth Amendment law, an arresting officer's request for identification does not, by itself, transform his mere encounter with an individual into an unconstitutional investigatory detention. *Commonwealth v. Au*, 42 A.3d 1002, 1007 (Pa.2012) ("[T]he law clearly recognizes that when an officer approaches a citizen and talks to that citizen without any assertion of authority, then what has transpired is a mere encounter.") In *Au*, the Pennsylvania Supreme Court reversed the trial court's suppression, and adopted Judge Shogan's dissent which emphasized the following relevant analysis:

> Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment. "[I]nterrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure."

*Id.* at 1005. Moreover, "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [and] ask to examine the individual's identification." *Id.* at 1007(internal citation omitted). Additionally:

> Our Supreme Court has adopted an objective test for determining whether a police officer has restrained the liberty of a citizen such that a seizure occurs. The pivotal inquiry in making this determination is whether a reasonable [person] innocent of any crime, would have thought he [or she] was being restrained had he [or she] been in the defendant's shoes. A Court must examine all surrounding circumstances evidencing a show of authority or exercise of force, including the

9

demeanor of the police officer, the manner of expression used by the officer in addressing the citizen, and the content of the interrogatories or statements. If a reasonable person would not feel free to terminate the encounter with police and leave the scene, then a seizure of that person has occurred.

*Commonwealth v. Guess*, 53 A.3d 895, 900 (Pa. Super. Ct. 2012). "Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might by compelled." *Id.*

In this case, the officers' conduct and demeanor in approaching the men and asking them if they lived at the residence would not have conveyed to a reasonable individual, innocent of any crime, that he or she was being detained. *See Commonwealth v. Strickler*, 757 A.2d 884, 890 (Pa. 2000) ("In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained.") Officer Todd's interaction with Defendant, wherein the officer sought basic biographical information from him and his companions, constituted a mere encounter; to which Defendant was under no compulsion to respond. Additionally, the record belies any claim by Defendant that he was physically obstructed by virtue of the structural characteristics of the porch during the period in which he was asked to provide identification. The fact of the matter is that when Officer Todd (eventually) turned to perform his pat down of Defendant, he pivoted and fled, free of any obstructions or police contact.

With regard to Defendant's detention during the time in which they began their weapons pat down, the record aptly reflects that their decision to perform a weapons pat down for officer safety was justified in light of the surrounding circumstances. *See Commonwealth v. Guess*, 53 A.3d 895 (Pa. Super. Ct. 2012). "When an officer is justified in believing that the individual

10

whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others the officer may conduct a pat down search to determine whether the person is in fact carrying a weapon." *Commonwealth v. Simmons*, 17 A.3d 399, 403 (Pa. Super. Ct. 2011) (internal quotation and citation omitted). "The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Guess*, 53 A.3d at 901 (citing *Commonwealth v. Simmons*, 17 A.3d 399, 403 (Pa. Super. Ct. 2011)). In *Commonwealth v. Guess*, the Court held that the defendant failed to prove both that his underlying claim (that his trial counsel was ineffective when he opted not to file a suppression motion had merit), or that the outcome at trial would have been different if his counsel had filed a suppression motion. The Court concluded that the officers' investigatory detention was supported by reasonable suspicion of criminal activity and a justifiable belief in the need to protect officer safety. More specifically:

> Both [defendant] Guess and his co-conspirator matched the physical description given by the victim of two black males, one wearing a white shirt and the other a black jacket, and they were located within the apartment complex where the crimes took place. Detective DiBonaventura testified that these were the only males in the complex that fit the description. . . . Given these circumstances, together with the fact that there was an alleged burglary, Detective DiBonaventura was justified in believing that criminal activity was afoot and that a pat-down search was necessary for officer safety.

*Guess*, 53 A.3d 895, 901–02 (Pa. Super. Ct. 2012). Similarly, in this case, given the high crime area, recent unsolved reports of gun violence, the fact that these men fit the description given by the anonymous tipster for a group of men selling drugs four houses away in broad daylight, they were the only individuals visible on the block to the officers who arrived approximately 6 minutes after receipt of the tip, and that they were admittedly trespassing, the officers were justified in believing that criminal activity was afoot. As Officer Todd testified, Sergeant Crescitelli's Report of Criminal Activity advising of two incidents involving gun fire in the days

11

prior, was fresh in the officers' minds.[31] Not only did these men fit the somewhat vague description of black men in white tee-shirts, but more importantly, Officer Todd testified these men were the only individuals within the proximity of the corner identified in the tip to which the officers responded within minutes; thereby increasing the likelihood that they were the subject of the tip that heroin was being sold. Thus, even assuming the mere encounter transformed into an investigatory detention, it would have been well supported by the surrounding circumstances and reasonable suspicion that criminal activity was afoot. As such, Defendant has failed to establish that his counsel lacked a reasonable basis for not pursuing a suppression claim based on that mere encounter and/or alleged investigatory detention. Counsel's credibility in filing frivolous motions is always at stake.

For his part, counsel testified that while he is always concerned about suppression in cases such as this where a suspect is confronted by police, here he determined such a motion did not have a strong likelihood of success in light of the totality of the circumstances. Counsel explained his decision not to move for suppression as follows:

> I did a little case-law research, and I saw that taking headlong flight is
> cause for reasonable suspicion and he ran twice, and he was a trespasser
> on somebody else's curtilage, I didn't think I had a good issue for
> suppression. Had he been standing on a corner in a public area, it may be
> a different story. But because he was on that lady's steps, I didn't think I
> had a good shot. . . .
>
> I thought it was a reasonable exercise of police power to question them
> and to determine whether or not they lived there; and when they said they
> didn't, to ask for identification. [32]

Additionally, after conducting his own investigation, including, contrary to Defendant's assertion, a visit to the porch steps where police initially confronted Defendant, speaking to

---

[31] [N.T. 8/16/16, at 65, Ex. D-1 ("Report of Criminal Activity")].
[32] [N.T. 8/16/16, at 13- ].

12

Defendant's friends who witnessed the events which unfolded that day, and reading the police report, counsel determined that the police had the requisite reasonable suspicion for an investigative detention of Defendant after the mere encounter, as Defendant was trespassing at the time.[33] Given that police officers do not need any level of suspicion to engage in a mere encounter, such as that which initially transpired in this case, and that the facts which arose from that mere encounter provided the basis for an investigatory detention, counsel's determination that suppression was not warranted was reasonable. *See Commonwealth v. Mendenhall*, 715 A.2d 1117, 1119 (Pa. 1998).

### ii. Contrary To Defendant's Second Claim of Error, Counsel Did Visit The Scene, And As Such That Claim Is Moot.

Next, Defendant claims counsel was ineffective for failing to visit the porch where police initially encountered Defendant, as well as the path of Defendant's flight and ultimate apprehension. A review of the record belies Defendant's contention, and as such any alleged error asserted therein is deemed moot.

Contrary to Defendant's characterization, and as demonstrated below, counsel did in fact visit the locations involved in Defendant's encounter with police:

PCRA Counsel:     Do you recall the intersections where the initial encounter between my client and the police took place?

Counsel:     I recall visiting the area where - - the steps where it took place; yes.

PCRA Counsel:     So you did visit the area.

Counsel:     Yes, I did.

                        . . .

PCRA Counsel:     Was there anything about the scene that caused you to consider any possible suppression claims?

---

[33] [N.T. 8/16/16, at 12- 13].

13

Counsel: Before I got there, yes. After I looked at and walked it, and after I talked to the officers, and going to where the initial confrontation or stop took place, and going to the area where the gun was found, and going near where he jumped into the river – I didn't go down to the river – I observed that – and I compared his story and the police officer's story and the witnesses that I talked to story, and I didn't see any . . . issues . . . .[34]

As demonstrated, counsel visited the pertinent locations during his investigation on behalf of Defendant, and thus, any alleged error is deemed moot.

### iii. No Grounds For Retrial Existed, And Thus No Error Is Attributable To Trial Counsel For Alleged Failure To File A Motion To Bar Retrial.

Next Defendant alleges counsel was ineffective where he failed to file a motion to bar retrial. As demonstrated below, counsel lacked a sound basis upon which to seek to bar Defendant's retrial. Additionally, even if counsel had filed such a motion, it would have been denied by the Court as the record is devoid of any evidence of either the requisite prosecutorial misconduct or any intentional conduct untaken by the Commonwealth to prejudice Defendant.

"An appeal grounded in double jeopardy raises a question of constitutional law." *Commonwealth v. Kearns*, 70 A.3d 881, 884–85 (Pa. Super. Ct. 2013)(internal quotation omitted). The appellate court's scope of review in making a determination on a question of law is plenary, and its standard of review is *de novo*. *Id.* (quoting *Commonwealth v. Vargas*, 947 A.2d 777, 780 (Pa. Super. Ct. 2008)). The factual findings of the trial court are nonetheless entitled to deference, and as such, the appellate court shall not substitute its judgment on issues of credibility and weight of the evidence. "The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record." *Id.* (quoting *Commonwealth v. Wood*, 803 A.2d 217, 220 (Pa. Super. Ct.2002) (internal quotation omitted).

---

[34] [N.T. 8/16/16, at 11- 12].

14

In Pennsylvania, "the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Kearns*, at 884 (referencing *Commonwealth v. Smith*, 615 A.2d 321, 325 (Pa. 1992)). As articulated by our Superior Court in *Commonwealth v. Chmiel*, "[a] fair trial, of course is not a perfect trial. Errors can and do occur. That is why our judicial system provides for appellate review to rectify such errors. However, where the prosecutor's conduct changes from mere error to intentionally subverting the court process, then a fair trial is denied." Id. at 884 (quoting *Commonwealth v. Chmiel*, 777 A.2d 459, 464 (Pa. Super. Ct. 2001)). "[M]ost forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial." *Id.* at 885.

As previously discussed, the Court was compelled to grant a mistrial during Defendant's first jury trial after counsel objected to the Commonwealth's placement of the weapon in the jury's plain view, in advance of its admission, which was questionable in light of defects in its chain-of-custody. Upon counsel's objection, the following exchange occurred:

The Court: Let me explain on the record where we are and what had occurred. During a side bar conference with counsel, I had been advised that counsel for the Commonwealth does not wish to introduce the gun into evidence. That was the representation that is being made to me at the time. Correct, counsel?

The Commonwealth: Correct, Your Honor.

The Court: However, during the course of the proceedings this morning, the gun that is not in evidence and was not intended to be introduced or shown to the jury was sitting on counsel table, because the officer just clearly didn't know. No one is assessing any blame or fault or anything, but the officer wasn't aware of counsel's strategy and, therefore, didn't know not to have it on the table. It was appropriate otherwise to have it on the table. But the fact is that the jury, that gun and the ammunition was in clear view of the jury throughout this entire proceeding this

15

|  |  | morning, and it's not evidence, it was not intended to be evidence, and counsel for the defense has requested an opportunity to address this issue with the Court. |

Counsel: Yes, Your Honor. We're going to ask for a mistrial, because the object, the gun, was in plain view of the jury, it's inflammatory, it's prejudicial, and it's not appropriate.

The Court: You understand that this does not constitute prosecutorial misconduct.

Counsel: I understand that.

The Court: You understand your client is still going to be tried on this offense.

Counsel: I understand that, Your Honor, should the Commonwealth reissue a warrant and arrest him.[35]

As demonstrated above, the officer's unintentional conduct in placing the weapon within the jury's view did not rise to the level of prosecutorial misconduct, which would have invoked double jeopardy protections. Instead, all parties involved agreed, and most importantly, the trial court observed and found, the objectionable conduct was the result of a mere oversight, which would not bar Defendant's retrial. As such, counsel explained his reasonable basis for not seeking to bar his client's retrial during the following exchange at the PCRA hearing:

PCRA Counsel: Why did you not pursue a double-jeopardy motion?

Counsel: I didn't think that the – I didn't think it was intentional and purposeful. I thought it was just an accident, an oversight, and that's why I didn't pursue the prosecutorial misconduct. And the reason why I say that is based on my interactions with the prosecutor as we prepared for trial and during the trial. The only thing that sticks out in my mind is the fact that he only moved forward on the first count, and he didn't bring in the other gun count. And to me, that was a huge break. That was a big break for us. And so, based on how we had been interacting, based on at least listening to my request to try to get under three to six. And I want to say, after the mistrial, I think – I'm pretty sure he came back with a two-to-four offer, that we turned down. So, after the mistrial, he was willing to give us a better deal, and we didn't take it. So that bespoke of his attitude towards this case. And I didn't think him leaving those guns on the table was intentional or purposeful. I thought it was just an oversight of a guy who was trying to do his job and just overlooked it. [36]

---

[35] [N.T. 6/19/12, 19-21].
[36] [N.T. 8/16/16, at 33-34].

16

As delineated above, Defendant has failed to establish counsel was ineffective for opting not to file a motion to bar retrial. In the first instance, the PCRA Court acted well within its discretion in determining that Defendant's underlying claim lacked arguable merit as the record lacks any evidence of intentional conduct by the prosecutor to prejudice Defendant, let alone prosecutorial misconduct. In light of the dearth of evidence substantiating either the requisite prosecutorial misconduct or prejudice inuring to Defendant such that he was denied a fair trial, Defendant's underlying claim is meritless. Additionally, as counsel testified, given the potential sentencing implications Defendant faced if convicted, counsel did not want to file frivolous motions in bad faith and risk tainting his strong working relationship with the Commonwealth. Counsel testified that he held out hope for a negotiated plea even after the mistrial, and recalls the Commonwealth verbally offering Defendant two (2) to four (4) years to run concurrent at that time; which his client rejected. Based on counsel's recollection, he and the prosecutor had developed a good rapport, the existence of which is bolstered by the fact the Commonwealth opted to proceed on only one of the two pending gun charges; a boon to Defendant's case. Thus, in addition to the record providing no support for filing such a motion, counsel had independent reasonable grounds for opting not to file a motion to bar retrial. Having failed to meet his burden of proving his underlying claim had arguable merit, nor that counsel lacked a reasonable basis for his conduct, Defendant's claim of ineffectiveness fails.

*iv. Counsel Was Not Ineffective For Failing To File A Direct Appeal Where Court Found No Credible Evidence To Substantiate Defendant's Alleged Request.*

Defendant also claims counsel was ineffective because he did not file a direct appeal, despite Defendant's alleged request to do so. The Court finds Defendant's claim not credible, and as such counsel was not ineffective for failing to file a direct appeal on Defendant's behalf.

17

While the law presumes counsel ineffective for failing to file an appeal, Defendant here has failed in the first instance to meet his burden of demonstrating he requested such an appeal be filed. *See Commonwealth v. Wilkerson*, 416 A.2d 477, 479 (Pa. 1980); *see also, Commonwealth v. Bath*, 907 A.2d 619, 622 (Pa. Super. Ct. 2006); *Commonwealth v. Collins*, 687 A.2d 1112, 1115 (Pa. 1996)). Defendant provided neither documentary, nor testimonial evidence to support his bald allegation that he asked counsel to file an appeal. Moreover, at the PCRA hearing, Counsel testified credibly as to his basis for not filing a direct appeal in the following exchange:

PCRA Counsel: Mr. McDuffy, did Mr. Jones ask you to file a direct appeal?

Counsel: I don't recall him doing that. At the end of the trial – this is what I remember. At the end of the trial, I gave him all my notes and all of the documents we had on the table. And I told him, here's all the stuff – this is what I think I remember telling him – here's all the stuff from the trial, in case you want to file an appeal or you want to file a PCRA, whatever you gotta do, here's all your stuff. But I don't remember him ever reaching out to me and saying, I want you to file an appeal. I don't remember that.

PCRA Counsel: So it was your view that – based on what you just testified to, it was your view that, at the time he was sentenced, your duty to him was complete.

Counsel: Yes. Unless he contacted me and said to file an appeal.[37]

Based on counsel's reasoned analysis of the case, including the tactics he undertook to avoid trial, a course carefully chosen to spare Defendant the imposition of a potentially weighty sentence, coupled with his decision to avoid filing frivolous motions to suppress or bar retrial, this Court found counsel credible. The undersigned in its discretion does not find credible Defendant's unsupported claim, and thus no error can be attributed to counsel.

---

[37] [N.T. 8/16/16, at 34-35].

18

*v. Counsel Was Not Ineffective For Allegedly Failing To Impeach Officer Todd Over One Minute Discrepancy.*

Finally, Defendant asserts that counsel was ineffective for failing to more thoroughly cross-examine Officer Edward Todd over certain alleged discrepancies in the record. Based on the record before it, including counsel's well-reasoned explanation for the manner in which he cross examined Officer Todd, the Court concludes Defendant has failed to prove his counsel was ineffective in this regard.

At the PCRA hearing, counsel testified that he had examined Officer Todd rather extensively at trial, specifically on the officer's recollection of the chase involved in apprehending Defendant. More specifically, counsel examined Officer Todd about Defendant's overhand toss of the weapon while in flight, and his proffered defense and the possibility that another individual might have placed the weapon in the location where it was ultimately recovered.[38] Despite counsel's thorough examination of Officer Todd at trial, Defendant complains counsel was ineffective in failing to impeach him over the exact time and specific sequence of events leading to his arrest. More specifically Defendant takes issue with Officer Todd's retrieval of the gun and points out that at trial the officer testified that he had discovered the gun *after* Defendant was taken into custody; but the radio transmission transcripts reflect Officer Todd retrieved the gun after he abandoned chase of Defendant, but *before* he was taken into custody. At the PCRA hearing, when presented with the radio transmission time entries, Officer Todd testified that they reflected that he recovered the gun at 14:29:34, and Corporal Lawless apprehended Defendant 14:30:00; thereby clarifying that the gun was recovered before

---

[38] [N.T. 8/16/16, at 42-].

19

defendant was taken into custody.[39] For his part, counsel provided a reasonable basis for his cross examination of Officer Todd and decision not to interrogate him over this one minute timing discrepancy, in the following exchange:

The Commonwealth: If there was a small inconsistency, say a one-minute time difference, would you cross-examine on that?

Counsel: It depends. It depends on how much mileage I could get out of the answer, and it also depends on where it is in the cross-examination. Because when I'm cross-examining somebody, I'm checking the jury to see what the response is. And I was kind of hammering officer Todd a little bit hard. And I was watching the jury, and I was getting the feeling they weren't liking the way I was coming at him kind of hard like that. And so I kind of was determined to ask the questions that I thought I needed to ask, to put reasonable doubt on the fact of where the gun was and his recollection of the chase, and how the gun landed, and where the gun was found, and the time lapse between the toss of the object that made the metallic sound when it hit the ground, and the fact that that area was unsecured. I thought that -- as I think I said in those letters to Mr. Jones – we had to create reasonable doubt about that part. And that was the essence of the case. High crime area, metallic object hits the ground, tossed by this guy running way [sic], unsecured, could have been put there by anybody, somebody else could have put it there. But I didn't want to go and ask him knit-picky questions just to embarrass the man or make him look liar a liar. I wasn't getting that kind of vibe from the jury. I was getting a vibe where maybe we could get some discrepancies between his recollection, and/or the mechanics or the physical layout of the area, to get reasonable doubt about the gun and then way it was tossed and where it was found.

The Court finds Defendant's underlying claim lacks arguable merit, as even if counsel had tried to cross examine Officer Todd regarding this minor discrepancy, it would not be of such significance to effect a different outcome. Moreover, counsel set forth a reasonable and credible explanation for his course of conduct, and Defendant has failed to prove he suffered prejudice as a result of counsel's cross examination strategy. As such, Defendant's final ineffectiveness claim fails.

---

[39] [N.T. 8/16/16, 84-86].

20

## IV. CONCLUSION

Accordingly, the trial court respectfully requests that its Order, dated May 15, 2017, denying Defendant's Second Amended PCRA Petition be AFFIRMED.

BY THE COURT:

THOMAS C. BRANCA,                    J.

Copies of the above Opinion
Mailed on: 9/25/17
**By Interoffice Mail:**
Montgomery County Public Defender's Office
Montgomery County District Attorney - Appellate Division
Deputy Court Administrator-Criminal

Secretary

21